RECEIVED

MAR 31 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

---

FLOYD HAMILTON, III                                          CIVIL ACTION NO. 09-0860

-vs-                                                                                    JUDGE DRELL

SHIVANI NEGI, et al.                                         MAGISTRATE JUDGE KIRK

---

## REASONS FOR JUDGMENT

This suit arose from the death of Plaintiff Floyd Hamilton, III's father, Floyd

Hamilton, Jr. ("Mr. Hamilton"), a military veteran and patient at the Veterans Affairs

Medical Center ("VAMC") in Alexandria, Louisiana. Although this case is not necessarily

factually complicated from a purely legal perspective, it has been extremely complex

from the perspective of Plaintiff's apparently close relationship with his father and his

perceptions of mistreatment while Mr. Hamilton was hospitalized during his last illness.

Throughout the years this case has been pending, we have been well aware of the

obvious love that Plaintiff had for his father, and the strong emotional and protective

instincts he exhibited as a result of what he saw as injustice.

Indeed, we cannot say that Plaintiff had no reason to be upset with one physician

on the VAMC staff, namely Dr. Shivani Negi. While we do not conclude there was

medical malpractice based on the legal analysis we must conduct to decide the case, we

still were singularly unimpressed by Dr. Negi's attitude in communicating with Mr.

Hamilton's family. To put it plainly, after trial of Mr. Hamilton's hospitalization, Dr. Negi's

bedside manner was at best curt, and at worst scornful.

This case was also complicated by the nature of the original and subsequent pro se pleadings, as well as the appearance, and then realization, of a number of different attorneys who have represented Plaintiff over the course of this litigation, all of whom have now withdrawn, including the attorneys who tried this case. Accordingly, we have proceeded carefully, trying at every occasion to allow Plaintiff the widest latitude to see if, indeed, there was a viable claim anywhere in the mix of strong feelings and emotions. Our concerns in this matter led us to a three-day bench trial on June 11–13, 2013.

Following the trial, we allowed the parties an opportunity to submit the deposition of Plaintiff's expert, Dr. Benjamin Walton, limited evidence regarding Dr. Negi's credentialing, and supplemental proposed findings of facts and conclusions of law. See Order, Doc. 254. All post-trial submissions have since been made, and we now address the merits of the suit. For the reasons set forth below, compiled after careful review of the evidence, argument, and briefs of Plaintiff and counsel, we are compelled in following the law to render judgment in favor of Defendant, the United States of America.

## I.    Background

Plaintiff, Floyd Hamilton, III,[1] filed this suit in May 2009 seeking damages for the death of his father, Floyd Hamilton, Jr., as a result of the allegedly substandard care he received at the VAMC during the weekend of September 23, 2006. After twice amending his original complaint for damages (Docs. 13 & 76), Plaintiff filed an amendment to his

---

[1]   Mrs. Bertha Hamilton was a consolidated plaintiff for discovery purposes until her claims were severed on March 23, 2012. (Docs. 164, 165). By Judgment signed November 19, 2012, we adopted a Report and Recommendation dismissing Mrs. Hamilton's claims based on the running of the statute of limitations. (Case No. 10-cv-0664, Doc. 103).

second amended complaint on February 2, 2011 (Doc. 86) ("Amended Complaint"), naming the United States of America ("Government") as the proper Defendant. This most recent pleading articulates the legal claims and factual basis for Plaintiff's present suit, which is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*.

Plaintiff alleges that Mr. Hamilton suffered brain injury due to oxygen deprivation, coma, and eventual death by sepsis as a result of the medical negligence of Dr. Shivani Negi and the VAMC. Specifically, Plaintiff claims that during the weekend of September 23, 2006, Dr. Negi negligently removed Mr. Hamilton from oxygen-supportive respiratory support, discontinued his antibiotic coverage, and transferred him out of the intensive care unit ("ICU") to a nonacute room where he was not seen by medical personnel for five hours, and that without appropriate respiratory support, he suffered aspiration and prolonged apnea, resulting in irreversible brain damage due to oxygen deprivation. Further, Plaintiff alleges that the VAMC was medically negligent in failing to provide cardiac monitoring equipment and respiratory support for Mr. Hamilton during the September 23 weekend, and in deliberately disregarding the family's wishes that Mr. Hamilton receive complete medical support.

The Government filed an answer denying all allegations of negligence by Government employees and asserting several affirmative defenses, including that Plaintiff's recovery is limited to the amount claimed administratively. (Doc. 86). This ruling follows a three-day bench trial on the merits held on June 11–13, 2013, at which extensive evidence was presented by both sides.

3

II.   **Applicable Law**

This case is properly before the Court under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, which authorizes suits against the United States for personal injury or death caused by the negligence or wrongful act of a government employee "under circumstances in which a private person would be liable under the law of the state in which the negligent act or omission occurred."[2] Hannah v. U.S., 523 F.3d 597, 601 (5th Cir. 2008) (citations omitted); see also 28 U.S.C. §§ 1346(b)(1), 2674. Under the FTCA, liability for medical malpractice extends to the Government "in the same manner and to the same extent as a private individual under like circumstances" and is controlled by state substantive law. 28 U.S.C. § 2674; Estate of Sanders v. U.S., 736 F.3d 430, 435  (5th Cir. 2013). Accordingly, Louisiana medical malpractice law governs this dispute.

A.   **Medical Negligence**

In this case, Plaintiff alleges that Dr. Negi improperly extubated Mr. Hamilton, discontinued his antibiotic coverage, and moved him from the ICU to a nonacute floor without ensuring sufficient respiratory support, and that these actions caused Mr. Hamilton to suffer irreversible brain damage due to oxygen deprivation. Under Louisiana law, the plaintiff in a medical malpractice action has the burden of proving, by a preponderance of the evidence:

---

[2]   We note that all of the threshold elements of the FTCA are met. See, e.g., Government's Answer, Doc. 86 (admitting that this Court has jurisdiction under the FTCA over the claims of Floyd Hamilton, III); Department of Veterans' Affairs Office of Inspector General Healthcare Inspection, Pl. Exh. 12 (finding no evidence of malpractice with respect to Plaintiff's administrative claims); Defendant's Proposed Findings of Fact and Conclusions of Law, Doc. 272 at 46–47 (admitting that Dr. Negi was within the course and scope of her employment with the VAMC at all relevant times).

4

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injures that would not otherwise have been incurred.

La. R.S. § 9:2794. In other words, to prove medical malpractice, the plaintiff must establish: (1) the relevant standard of care; (2) a violation of that standard of care; and (3) a causal connection between the alleged negligence and the resulting injuries. Johnson v. Morehouse Gen. Hosp., 63 So. 3d 87, 95–96 (La. 2011).

As a general rule, expert testimony is necessary to establish the applicable standard of care and a breach of that standard of care. Samaha v. Rau, 977 So. 2d 880, 884 (La. 2008) (citations omitted). But when the alleged acts of negligence concern a particular medical specialty,

then only physicians in that specialty may offer evidence of the applicable standard of care. In other words, to succeed in a medical malpractice claim against a medical specialist, the plaintiff must offer testimony of the applicable standard of care in the particular specialty of the allegedly negligent doctor and the proffered expert must specialize in that peculiar field.

Cleveland ex rel. Cleveland v. U.S., 457 F.3d 397, 403–04 (5th Cir. 2006) (internal citations omitted). Although causation is not expressly included among the elements for which

expert testimony is required, "typically expert testimony is required to prove causation when the resolution of that issue is not a matter of common knowledge." Gleason v. La. Dep't of Health & Hosp., 33 So. 3d 961, 966 (La. App. 2d Cir. 2010).

Louisiana jurisprudence provides additional guidance for the Court regarding interpretation of the evidence in medical malpractice cases:

> The physician's conduct is always evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised. The physician will not be held to a standard of perfection nor evaluated with the benefit of hindsight. . . .

> When medical experts are called to testify, the views of such expert witnesses are persuasive, although not controlling, and any weight assigned to their testimony by the trier of fact is dependent upon the facts on which the opinion is based as well as the expert's professional qualifications and experience. The trier of fact must assess the testimony and credibility of all the witnesses and make factual determinations regarding these evaluations.

Thibodaux v. Leonard J. Chabert Med. Ctr., 981 So. 2d 686, 689–90 (La. App. 1st Cir. 2007) (internal citations omitted).

Here, we find the salient issue to be whether the extubation and removal of oxygen-supportive respiratory support, the discontinuation of antibiotic coverage, and the transfer of Mr. Hamilton from the ICU to a nonacute floor breached the standard of care. We will address each of these alleged acts of medical negligence in turn after an analysis of the facts.

### B. Informed Consent

Plaintiff also claims that the VAMC was medically negligent in disregarding the family's wishes that Mr. Hamilton receive complete medical support. In this respect, Plaintiff seeks to recover under a theory of medical battery. Under Louisiana law, medical

battery is treated as a lack of informed consent. See Lugenbuhl v. Dowling, 701 So. 2d 447, 453 (La. 1997) ("We therefore reject battery-based liability in lack of informed consent cases (which include no-consent cases) in favor of liability based on breach of the doctor's duty to provide the patient with material information concerning the medical procedure."). The Louisiana Supreme Court has recognized that "'the only theory on which recovery may be obtained is that of negligence' in a lack of informed consent case." Thibodeaux v. Jurgelsky, 898 So. 2d 299, 314 (La. 2005). As in a case of medical negligence, the plaintiff in an informed consent action must establish the following elements:

> (1) the existence of a material risk which the physician must disclose;
>
> (2) the failure of the physician to inform the patient of a material risk;
>
> (3) the realization of the material risk; and
>
> (4) a causal connection between the failure to inform the patient of the risk and realization of the risk.

Maybrier v. La. Med Mut. Ins. Co., 12 So. 3d 1115, 1119 (La. App. 3d Cir. 2009) (citations omitted).

III.   **Facts and Evidence**

A.   **VAMC Treatment**

1.   *Medical History, Diagnosis, and Initial VAMC Treatment*

Floyd Hamilton, Jr., an 84-year-old military veteran, was hospitalized at the VAMC from July 2006 until his death on May 20, 2009. Mr. Hamilton was a heavy smoker and suffered from several health ailments, including hypertension and a history of stroke.

However, Plaintiff testified that Mr. Hamilton had good health throughout his life and did not recall any major health conditions prior to 2006.

At the insistence of his speech therapist, Mr. Hamilton presented at the VAMC emergency room with difficulty swallowing, slurred speech, and increasing right-sided weakness on July 31, 2006, approximately four weeks after his hospitalization at Cabrini Hospital for an acute right-sided stroke.[3] He was admitted with a diagnosis of aspiration pneumonia, urinary tract infection, and possible worsening of or compounding stroke. At this time, Mr. Hamilton was unable to stand or walk without assistance. He was treated with antibiotics, blood thinners, physical therapy, and pulmonary support. A computed tomography scan ("CT scan") of Mr. Hamilton's brain showed cerebral atrophy[4] and an old right-sided cerebellar infarct.[5] (Pl. Exh. 12). After a neurological evaluation, he was found to have significant stenosis of his left carotid artery and possible normal pressure hydrocephalus. On August 2, 2006, he was transferred to the Houston Veterans' Affairs Medical Center, where he underwent a left carotid endarterectomy.

While recovering from surgery, Mr. Hamilton developed signs of pneumonia and labored breathing. He was transferred back to the Alexandria VAMC on August 28, 2006.

--------------------------------------------------

[3]  Mr. Hamilton's medical history revealed two prior visits to the VAMC in July 2006. On July 11, 2006, Mr. Hamilton presented at the VAMC emergency room with vague abdominal pain, which was determined to be non-emergent and possibly related to constipation, and was referred to the podiatry clinic for toenail trimming. Mr. Hamilton visited the VAMC podiatry clinic for toenail trimming again on July 25, 2006.

[4]  Cerebral atrophy is a wasting away of brain cells and tissue. (Pl. Exh. 12).

[5]  A cerebellar infarction is death of tissue in a portion of the cerebellum due to a sudden loss of arterial or venous blood supply. (Pl. Exh. 12).

Upon his return, a PEG feeding tube was placed, and Mr. Hamilton started regular tube feedings. Mark St. Cyr, M.D., a board-certified internist and VAMC hospitalist, began treating Mr. Hamilton on September 1, 2006. Dr. St. Cyr initially noted Mr. Hamilton was in deconditioning with a diagnosis of aspiration pneumonia post-cerebrovascular accident ("CVA") (stroke). During his trial testimony on cross-examination, he agreed that Mr. Hamilton's initial prognosis was poor. Nevertheless, he repeatedly discussed Mr. Hamilton's condition and clinical course with the patient's family and documented their desire to have Mr. Hamilton remain at "full code" status.[6]

On September 7, 2006, Mr. Hamilton was found in respiratory distress, possibly from acute aspiration, and a code[7] was called. Although he maintained adequate pulse and pressure, Mr. Hamilton required endotracheal intubation[8] by anesthesia. He was then transferred to the ICU and placed on oxygen-supportive mechanical ventilation. Dr. St. Cyr testified that, more likely than not, Mr. Hamilton experienced hypoxia[9] as a result of this episode. In addition to transferring Mr. Hamilton to the ICU, Dr. St. Cyr prescribed him intravenous ("IV") Digoxin for his heart, dopamine for blood pressure support, and IV Ativan for agitation. He also obtained a chest x-ray, which showed bilateral infiltrates

---

[6] "Full code" means a  patient is to receive all resuscitative measures, which can include nutritional support, intubation, and/or chest compressions, in end-of-life situations.

[7] A "code" or "Code Blue" is an emergency response to a cardiac or respiratory crisis felt to possibly require resuscitation.

[8] Intubation is the placement of an endotracheal tube down the patient's throat to assist with breathing, airway protection, and suctioning.

[9] Hypoxia is the deprivation of adequate oxygen to the brain, which can result in brain damage.

consistent with aspiration pneumonia. Dr. St. Cyr's clinical impression was CVA, aspiration pneumonia secondary to CVA, and respiratory failure.

On September 9, 2006, Mr. Hamilton self-extubated and was placed on an oxygen mask. He remained under ICU observation until the morning of September 11, 2006, when he was moved to 7B North, the third-floor telemetry unit located outside of the ICU. Review of the medical record reveals that Mr. Hamilton was alert, responsive, slightly verbal, and exhibiting signs of voluntary limb movement at this time. However, Dr. St. Cyr recommended community nursing home placement for long-term supportive care, which he discussed with Plaintiff. Dr. St. Cyr also indicated that Mr. Hamilton was not a good candidate for physical therapy and thus was not eligible for placement in the VAMC nursing home.

Mr. Hamilton experienced another sudden arrest from possible aspiration on September 14, 2006. The medical record documents that around 18:12 hours, Mr. Hamilton was sitting up and nodding his head in response to questions. Approximately 20 minutes later, however, he was found to be unresponsive and foaming at the mouth with ineffective respirations, again from possible aspiration. Unlike the previous episode, Mr. Hamilton experienced a loss of pulse at this time. A code was called, advanced cardiovascular life support protocol was followed, and he was emergently reintubated by Dr. St. Cyr, who subsequently transferred Mr. Hamilton back to the ICU. Mr. Hamilton was again placed on oxygen-supportive mechanical ventilation and dopamine for blood pressure support. Plaintiff was informed of the change in Mr. Hamilton's condition and

10

reiterated his desire that Mr. Hamilton remain at full code status and receive every means of support.

Dr. St. Cyr specifically recalled treating Mr. Hamilton on September 14, 2006. He indicated that the patient was without oxygen for at least five minutes during that event. When asked about the effect of this episode on Mr. Hamilton's neurological condition, Dr. St. Cyr testified as follows:

> Q:   Did the patient's neurological condition change following this incident?
>
> A:   According to the review of the chart, overall, no, sir.
>
> Q:   Okay. Are you saying you don't know if the patient experienced any anoxic injury at this time?
>
> A:   I would have to say this, and no one can say with any degree of certainty, but if he was foaming at his mouth, if he required intubation, then certainly he experienced some anoxia or decreased blood flow to his vital organs, whether it be his heart or his brain.

(R. at 88–89). In his post-trial deposition, Plaintiff's expert, Dr. Benjamin Walton, testified that anoxic injury generally is irreversible.

The next day, Dr. St. Cyr observed sluggish pupils, occasional grimacing, and no movement of the extremities. Other VAMC progress notes report unresponsiveness and some eye opening in response to painful stimuli with non-reactive pupils. However, Mr. Hamilton's vital signs and oxygen improved. Again, Dr. St. Cyr's impression was CVA, aspiration pneumonia secondary to CVA, and respiratory failure. He began weaning Mr. Hamilton from mechanical ventilation and dopamine and continued his IV antibiotics for aspiration pneumonia. On or about September 18, 2006, Dr. St. Cyr obtained another CT scan of Mr. Hamilton's brain due to his decreased level of responsiveness. The CT scan

was without contrast; it showed an old right-sided cerebellar infarct, but there was no evidence of cerebral bleed, tumor, or other acute changes noted on the scan. On September 20, 2006, Dr. St. Cyr placed Mr. Hamilton's ventilator on the continuous positive airway pressure ("CPAP") setting,[10] which was the final stage of weaning him from mechanical ventilation. The following day, Dr. St. Cyr noted that Mr. Hamilton was "still not responsive [or] alert enough" for extubation and "at high risk of compromising his airway again." (Def. Exh. 1 at 14098).

Dr. St. Cyr saw Mr. Hamilton again on Friday, September 22, 2006. While he believed there was a chance Mr. Hamilton would improve at this time, he agreed Mr. Hamilton's long-term prognosis was still poor. During that visit, he observed "no response to [verbal] or physical stimuli," a "decreased level of alertness," a Glasgow Coma Scale ("Glasgow") score[11] of 3, and that Mr. Hamilton was breathing spontaneously on CPAP. (Def. Exh. 1 at 14083). Nursing notes also report voluntary movement of the upper and lower extremities. However, Dr. St. Cyr elected not to extubate Mr. Hamilton due to the patient's low Glasgow score, which suggested that he was essentially comatose, and because Dr. St. Cyr believed Mr. Hamilton would be unable to protect his own airway because of the likelihood of secretions. In Dr. St. Cyr's

---

[10] CPAP, also known as spontaneous breathing trial, is a weaning mode that allows the patient to breathe on his own. Although the patient's endotracheal tube is still attached to the ventilator, the machine does not initiate breathing or exhaling for the patient by delivering and taking away a set amount of oxygen. Rather, the patient initiates breathing and exhaling on his own, while the machine supplies mild pressure to help the patient overcome the discomfort of resistance from breathing through the endotracheal tube.

[11] Glasgow Coma Scale measures a patient's level of consciousness and is based on a nurse or physician's subjective assessment. Patients with a score of 3–8 are usually said to be in a comatose state.

view, continued intubation was the appropriate course of treatment on that date, both to protect Mr. Hamilton's airway and to allow for easier suctioning to avoid aspiration. Moreover, Dr. St. Cyr admitted "if we protect[ed] his airway, we would [have] avoid[ed] hypoxemia or hypoxia." (R. at 45). Still, he acknowledged that intubation did not guarantee Mr. Hamilton would not aspirate.

In connection with this September 22 visit, Dr. St. Cyr outlined the following treatment plan in his progress note:

> He has until next Thursday with the endotrach[eal] tube before considering trach[eostomy],[12] hopefully he'll become more responsive by then. No apparent reason for his decreased level of alertness. Other option will be to speak with the son again about reconsidering for DNR. If he comes off the tube with his Glasgow scale being a 3 then his airway is at high risk[,] thus the reason for leaving it in.

(Def. Exh. 1 at 14083). He discussed this approach with Plaintiff, who had power of attorney for Mr. Hamilton. Plaintiff testified that he thought Dr. St. Cyr had written an order in Mr. Hamilton's chart regarding this treatment plan. However, Dr. St. Cyr testified that he did not leave orders instructing subsequent physicians to keep Mr. Hamilton intubated. Moreover, both experts interpreted Dr. St. Cyr's note as a recommendation, rather than an order not to extubate Mr. Hamilton.

2.  *Treatment on September 23–24, 2006*

Dr. Shivani Negi, an internist at the VAMC, was the on-call physician covering 7B North and the ICU during the weekend of September 23, 2006. Dr. Negi first examined Mr. Hamilton during her morning rounds on Saturday, September 23. She testified that

---

[12] A tracheostomy is the surgical insertion of a breathing tube directly into the patient's windpipe (trachea). It provides more permanent airway protection than endotracheal intubation.

she reviewed his medical chart and conducted a clinical examination, which showed stable vitals and no signs of active infection. More significantly, she observed that Mr. Hamilton had been breathing on CPAP for three days and was "tolerating [it] well," which told her that he had enough brain function to support his own respiratory status. (Court. Exh. 1). Accordingly, she determined that Mr. Hamilton was stable enough for extubation.

Dr. Negi then called Plaintiff and informed him that she was going to remove Mr. Hamilton from mechanical ventilation and transfer him to the ICU.[13] Dr. Negi testified, and the medical record confirms, that they also discussed the possibility of reintubating Mr. Hamilton for aspiration or respiratory distress. Plaintiff informed her that he wanted "everything done" and reiterated his desire that Mr. Hamilton remain at full code status, which Dr. Negi twice noted in the patient's chart. (Court Exh. 1). Plaintiff testified that he objected to the extubation because it was not in line with Dr. St. Cyr's treatment plan, and that he told Dr. Negi he was on his way to the hospital. He also testified that Dr. Negi made upsetting comments about Mr. Hamilton, including that Plaintiff should "let him die." (R. at 267, 265, 393). While Dr. Negi did not recall Plaintiff objecting to her approach or coming to the hospital, she did admit that extubation was contrary to the wishes of Mr. Hamilton's family and to Dr. St. Cyr's recommendation. However, she did not believe the family's consent was required in order to extubate Mr. Hamilton. Moreover, she did not find that Mr. Hamilton's low Glasgow score or Dr. St. Cyr's note

---

[13] The record indicates that Dr. Negi had first spoken with the patient's wife, Bertha Hamilton, about an advance directive and that Mrs. Hamilton directed her to contact Plaintiff.

14

precluded extubation. Dr. Negi acknowledged that she did not contact Dr. St. Cyr to discuss his treatment plan, but had exercised her clinical judgment.

Later that morning, Mr. Hamilton was extubated and placed on 2 liters of oxygen by nasal cannula, which he "tolerated well." (Court Exh. 1). Dr. Negi and the ICU nurse reported that he was alert and awake, but responded only to pain. Although Plaintiff claimed he was at the hospital all day and repeatedly paged Dr. Negi, the medical record contradicts his account.[14]

Following the extubation, Mr. Hamilton remained in the ICU, where he received one-on-one supervision, for approximately 24 hours. VAMC progress notes show unresponsiveness, high oxygenation, stable vitals, unlabored respirations, and varying secretion levels during that period. Craig Stacy, R.N., the initial ICU nurse, observed that Mr. Hamilton's secretions had "slowed dramatically" post-extubation. (Court Exh. 1). On cross-examination, he agreed this was an improvement. His successor, Michael Mioton, R.N., obtained Dr. Negi's permission to have a nasal trumpet placed for suctioning purposes. Nurse Mioton testified that Mr. Hamilton received "a pretty fair amount" of suctioning post-extubation and that one-on-one attention was "critical" at that time. (R. at 238, 256). However, at the end of his shift, Nurse Mioton noted that "the patient ha[d] done well this tour." (Court Exh. 1). Around the same time, a respiratory therapist reported "copious [amounts] of thick yellow-white secretions." (Court Exh. 1). Nurse

---

[14] A nursing note authored by Craig Stacy at 11:44 hours, documents that Plaintiff "came to the hospital to see about father and discuss father's condition [and] stated *he would return tonight*." (Court Exh. 1) (emphasis added). Another note authored by Michael Mioton at 20:40 hours reports that "son came to visit about 30 minutes ago." (Id.).

Mioton testified that it was common for patients to generate a significant amount of secretions post-extubation.

Dr. Negi saw Mr. Hamilton again on the morning of Sunday, September 24, 2006, and noted that he was "doing well" but was not "waking up." (Court Exh. 1). She documented an oxygen saturation of 98% on nasal cannula and testified that she heard clear, bilateral breath sounds and no secretions when she listened to his chest. She also reviewed the duration of Mr. Hamilton's antibiotic coverage and noted the lack of a sputum culture in his chart. Although not documented in her progress notes, Dr. Negi testified that she considered Mr. Hamilton's neurological status, examined his vital signs and secretions levels, and looked for other signs of continued infection, including fever. From her review of the chart, she believed his secretions were decreasing overall. She also testified that Mr. Hamilton showed no signs of active infection upon examination. After this work-up, Dr. Negi concluded that Mr. Hamilton was stable enough to be moved to the floor and issued orders for his transfer. She also elected to discontinue Mr. Hamilton's antibiotic coverage and remove his central line based on his clinical presentation. Dr. Negi acknowledged that she did not obtain a blood test, x-ray, or culture, but had exercised her clinical judgment. Furthermore, Dr. Negi admitted that she did not obtain Plaintiff's consent for the transfer. Plaintiff likewise testified that he did not consent to the transfer and that he learned about the transfer from Nurse Stacy rather than from Dr. Negi.[15]

_____

[15] In the Amended Complaint, Plaintiff alleges that Dr. Negi did not notify Mr. Hamilton's family of the transfer. However, at trial, Plaintiff admitted that Dr. Negi told him she was going to move Mr. Hamilton out of the ICU during their September 23 telephone conversation. Likewise, Bertha Hamilton testified that Dr. Negi called her on September 23 and informed her that Mr.

Around 15:54 hours, Mr. Hamilton was transferred to a room on the fourth floor,

7C South, where one-on-one supervision and telemetry monitoring were not available.

Dr. Negi's transfer orders, which accompanied Mr. Hamilton to the floor, provided that

he receive oxygen via nasal cannula, that his vitals be taken every eight hours, and that

he receive aspiration precautions, such as head-of-bed elevation and suctioning through

a nasal trumpet every six hours. She also gave orders for regular PEG tube cleaning,

regular tube feedings, diabetes care, nebulizer treatments, blood pressure, gastric acid,

and ulcer medications, Ativan for agitation, potassium chloride for electrolytes, a stool

softener, aspirin, and acetaminophen. Nurse Mioton testified that patients on 7C South

used a call system to notify nurses when they were in distress. However, the evidence

indicates that Mr. Hamilton was incapable of pushing a call button or alerting medical

staff for assistance at this time.

On Sunday night, Mr. Hamilton was seen by Dr. Rakiya Akwa, the on-call

physician covering 7C South. Dr. Akwa noted "no response to call," "gurgly

respiration[s]," an oxygen saturation of 91% on nasal cannula, "worsening of bilat[eral]

infiltrates,"and "harsh [breath sounds] with diffuse rales."[16] (Court Exh. 1). Dr. Akwa

restarted Mr. Hamilton on antibiotics due to his worsening chest x-rays and indicated

the following plan after speaking to the nursing supervisor: "Will monitor pulse ox if [less

---

Hamilton would be transferred out of the ICU.

[16] Plaintiff also testified that he found Mr. Hamilton in distress and struggling to breathe on
Sunday evening. According to Plaintiff, Mr. Hamilton's stomach and jaws were moving in and
out and the nasal cannula was located on his shoulder.

than] 90% will transfer to ICU." (Court Exh. 1). Mr. Hamilton remained within the
acceptable oxygenation range overnight.

### 3.   *Post-Transfer Treatment and Remaining Hospital Course*

On Monday, September 25, 2006, Dr. St. Cyr resumed treatment of Mr. Hamilton.
He believed Mr. Hamilton's condition had worsened since his previous visit. Initially, he
noted labored respirations with periods of apnea, nasal bleeding, and the same
"decreased level of consciousness" he had observed prior to the weekend. (Def. Exh. 1
at 51). He transferred Mr. Hamilton back to the ICU because he believed the patient
"require[d] close monitoring" and "look[ed] as though he may tire out." (Id.). He also
consulted with an ENT regarding a possible tracheostomy but did not order reintubation
at that time. During an afternoon visit, Dr. St. Cyr observed an oxygen saturation of 80%
and that Mr. Hamilton was "using [his] accessory muscles, purse lipping[, and] having
increas[ed] difficulty handling [secretions]." (Def. Exh. 1 at 50). Accordingly, he
contacted an anesthesiologist around 15:15 hours and ordered that Mr. Hamilton be
reintubated by anesthesia and placed on mechanical ventilation. Upon reintubation, the
nurse anesthetist observed copious amounts of yellow secretions in Mr. Hamilton's
trachea.

While Plaintiff claims a code was called on September 25, the medical record
contradicts this assertion. According to VAMC progress notes, Dr. St. Cyr elected to
reintubate Mr. Hamilton to protect his airway and therefore to prevent him from coding.
Furthermore, Dr. St. Cyr testified that Mr. Hamilton's transfer was proactive, and he
denied calling a code. Both experts also testified that no code was called.

Review of the medical record reveals that Mr. Hamilton exhibited signs of neurological improvement after the weekend events. Indeed, Dr. St. Cyr witnessed Mr. Hamilton opening his eyes in response to verbal and physical stimuli and following with his eyes on September 26–27, 2006. Even though Mr. Hamilton was not fully alert, Dr. St. Cyr felt that this was an improvement. However, when asked whether Mr. Hamilton's chance of recovery decreased because of the extubation on September 23, Dr. St. Cyr testified that "[o]ne could say so, but you can't quantify how much [or] to what degree." (R. at 60–61).

On October 3, 2006, Mr. Hamilton underwent a neurological evaluation and was found to have a new left-sided cerebellar infarct. Upon recommendation by a VAMC staff neurologist, Dr. St. Cyr consulted with Dr. Riad Hajmurad, M.D., a board-certified neurologist at the Alexandria Neuro Center and Headache Clinic, to perform an electroencephalogram ("EEG") on Mr. Hamilton. The EEG results showed diffuse brain dysfunction consistent with hypoxia to Mr. Hamilton's brain. (Pl. Exh. 14). At trial, Dr. Hajmurad testified that an EEG shows what is currently happening to the brain and cannot be used to determine when prior damage occurred. On October 6, 2006, Dr. St. Cyr repeated a CT scan of Mr. Hamilton's brain. The following day, he observed that Mr. Hamilton was "very responsive," opening his eyes to voice, and "moving his head," but did not record any findings from the CT scan in the medical record. (Def. Exh. 1 at 45).

Mr. Hamilton's remaining hospital course was complicated by pneumonia, sepsis, a recurrent pnemothorax requiring chest tube placement via thoracostomy, episodes of aspiration, urinary tract infections, continuing need for ventilator support, GI bleeding

necessitating transfusions, renal failure, ventricular tachycardia, hypotension, and skin breakdowns. Despite repeated conversations between Plaintiff and VAMC personnel regarding Mr. Hamilton's long-term care needs and his disqualification for placement in the VAMC nursing home, Mr. Hamilton was never moved to a community nursing home or long-term acute care facility. He remained at the VAMC, where he received long-term supportive care, until he was pronounced dead after cardiac arrest and unsuccessful resuscitation attempts on May 20, 2009. His death certificate lists the cause of death as sepsis due to cerebral degeneration. At death and autopsy, he was also found to have bullous emphysema and invasive adenocarcinoma of the lung.

### B.   Testimony from Mr. Hamilton's Family

At trial, Plaintiff testified that he disagreed with Dr. Negi's course of treatment, which he found to be consistent with ending Mr. Hamilton's life. He believed that Dr. St. Cyr's treatment plan, on the other hand, was designed to help Mr. Hamilton improve and eventually recover. He stated that other physicians discussed Mr. Hamilton's medical condition and treatment with him, while Dr. Negi told him to let his father die.

Plaintiff also testified that Dr. Negi treated his father after he had requested a new physician. He explained that, in addition to making a written complaint with the patient advocate, he met with the chief of staff in December 2009 and asked that Dr. Negi no longer treat his father. However, he did not know when this request was conveyed to Dr. Negi. Dr. Negi testified that she was not informed of Plaintiff's request until January 2007, after her treatment of Mr. Hamilton. Although the medical record indicates otherwise, Plaintiff denied that he refused another physician who treated Mr. Hamilton.

Bertha Hamilton testified that prior to the weekend of September 23, 2006, she hoped her husband would recover. Mrs. Hamilton stated that she wanted her husband to remain in the ICU, and that she begged Dr. Negi not to proceed with the transfer. Upon questioning by the Government, she testified that Dr. Negi did not discuss Mr. Hamilton's extubation with her. Mrs. Hamilton described her dealings with Dr. Negi as unpleasant and testified that Dr. Negi told her Mr. Hamilton had lived a good life and was ready to die.

### C.   Expert Testimony

#### 1.   *Benjamin Walton, M.D.*[17]

Benjamin Walton, M.D., a board-certified pulmonary physician, offered post-trial deposition testimony and an expert report on behalf of Plaintiff.[18] Dr. Walton did not review Mr. Hamilton's entire VAMC record, but rather only the records from September 22–28, 2006. Furthermore, he relied on the excluded report of Dr. Velva Boles and on information he obtained during several conversations with Plaintiff in preparing his opinion. In deposition, he admitted that he knew Plaintiff socially and was sympathetic to Plaintiff's case.

---

[17] Although Dr. Walton did not testify at trial, the Court permitted the parties to supplement the record with Dr. Walton's post-trial deposition. See Order, Doc. 254.

[18] Dr. Walton is board certified in both internal and pulmonary medicine but has served only as a pulmonary medicine expert. For that reason, the Government has objected to his tender as an expert in the field of internal medicine. We find Dr. Walton to be duly certified, and the objection is overruled. See Aubert v. U.S., 2011 WL 1558787, *17 n.91 (E.D. La. April 21, 2011) ("It is well-established that where medical disciplines overlap, it is appropriate to allow a specialist in one field to give expert testimony as to the standard of care applicable to areas of practice common to both disciplines.") (citations omitted).

The expert believed that Dr. Negi's actions were not in line with the wishes of Mr. Hamilton's family or the standards regarding decision-making authority for Mr. Hamilton, and that they led to Mr. Hamilton's loss of his chance for recovery. In his report, he cited Dr. Negi's "somewhat rapid approach to weaning," the "premature" extubation of Mr. Hamilton, the discontinuation of his antibiotic coverage, and his transfer to the "unmonitored medical floor" as actions that were "more in line with terminal care" and against the family's wishes. (Walton Deposition Exhibits, Doc. 279, Exh. 3 at 1–2). However, he stated that Dr. Negi's actions "may not rise to the level of negligence or malpractice." (Id. at 2).

In deposition, Dr. Walton testified that he did not disagree with the decision to extubate and that it was a reasonable option under the circumstances. He explained that Dr. Negi had a duty, as Mr. Hamilton's treating physician, to assess his condition and decide whether or not extubation was reasonable. Further, he testified that the decision of whether or not to extubate Mr. Hamilton was a clinical judgment, which required Dr. Negi to do whatever she thought was correct at that time based on all of the information available to her. When asked about the standard for considering a patient's Glasgow score, he testified that Glasgow score was a reasonable but optional criteria for extubation and was not very important in this case. He also admitted that informed consent is not medically or legally necessary in order to extubate a patient, and that the VAMC Handbook did not list extubation as a procedure for which informed consent was required. Nevertheless, he acknowledged that Dr. Negi discussed the risks of extubation with Plaintiff.

Dr. Walton did find, however, that Mr. Hamilton's transfer to a lower level of care within 24 hours after extubation resulted in further neurological damage, thereby decreasing his meaningful chance of recovery and giving rise to his vegetative state. Dr. Walton testified that as a result of the transfer, Mr. Hamilton had difficulty clearing his secretions, struggled to breathe, and became tired, which impaired his oxygenation and caused his neurological impairments to worsen. The basis for his opinion was Mr. Hamilton's clinical presentation before and after the weekend in question. Dr. Walton testified, and the medical record confirms, that Mr. Hamilton exhibited signs of voluntary limb movement on September 22, 2006, but was described as "flaccid" on September 25, 2006. (Walton Deposition, Doc. 279 at 53; Pl. Exh. 91 at 14030). The description of flaccid paralysis told him that Mr. Hamilton was no longer showing meaningful neurological responses, thus signifying further brain damage. However, Dr. Walton confirmed that Plaintiff provided him with a limited number of medical records. Therefore, even though Dr. Walton was willing to link the transfer to Mr. Hamilton's neurological impairments and lost chance of recovery, Dr. Walton's opinion was based on incomplete medical records provided by Plaintiff.[19]

As to the standard of care, Dr. Walton testified that there is no standard observation period post-extubation and that the amount of observation time varies depending the patient's clinical symptoms. He explained the standard for moving a patient from the ICU to a nonacute floor requires a physician to evaluate the patient's condition and determine whether the patient has improved enough that the previous

---

[19] Dr. Walton was not aware that on October 4, 2006, Dr. St. Cyr documented movement of Mr. Hamilton's right leg and right upper extremity. (Def. Exh. 1 at 47).

level of support is no longer needed and that any expected complications or worsening of the patient's condition can be managed timely and appropriately at the lower level of care. He agreed that intensive care is not necessary if a patient is stable, does not have any acute neurological or cardiac issues, and is receiving care that is available on the floor. He also confirmed that Plaintiff did not provide him with a copy of Dr. Negi's transfer orders.

Dr. Walton believed that Mr. Hamilton demonstrated the ability to survive without mechanical ventilation after several days of observation on CPAP. However, he testified that Mr. Hamilton had significant secretions and findings of severe airway congestion after his extubation. Given Mr. Hamilton's tenuous condition, his family's desire to continue full support, and his subsequent need for reintubation and mechanical ventilation, Dr. Walton believed that Mr. Hamilton should have remained in the ICU for more than 24 hours post-extubation. He also felt that Mr. Hamilton's transfer to a lower level of care was consistent with an "aggressive backing off" of a care, which was against the family's wishes. (Walton Deposition, Doc. 279 at 90). But upon questioning by Plaintiff's counsel, Dr. Walton found no standard of care breach with respect to the transfer:

> Q:    Did [Dr. Negi] follow the standard of care by removing Mr. Hamilton from ICU so quickly and aggressively in light of Dr. St. Cyr's plan and the family's wishes?
>         * * * *
> A:    Yeah . . . [because] once a doctor is covering for you, they - - they assume responsibility for the patient, so it is reasonable for them to use their judgment to treat the patient as they - - they see fit.

(Id. at 116–17).

24

Finally, Dr. Walton's report did not question Dr. Negi's decision to discontinue antibiotics. In deposition, Dr. Walton explained that the decision to discontinue antibiotics, like extubation, is a clinical judgment; it requires the physician to determine whether the patient has an active infection by looking at the patient's entire clinical picture and factors such as his most recent x-ray, oxygenation status, white blood cell count, the presence or absence of fever, and the amount or type of secretions. The expert acknowledged that Dr. Negi was aware of the risk of pneumonia and that information regarding Mr. Hamilton's clinical picture, such as blood test results, fever history, and vital signs, was available in his ICU chart. Therefore, he could not conclude that Dr. Negi failed to examine Mr. Hamilton's entire clinical picture before discontinuing his antibiotic coverage. In fact, he deferred to Dr. Negi's clinical judgment as to whether Mr. Hamilton had pneumonia because she was the patient's treating physician and observed his condition at that time.

> 2.   *Russell Tynes, M.D.*

Russell Tynes, M.D., prepared an expert report, which was stipulated into evidence, and testified on behalf of the Government. Dr. Tynes is board certified in internal medicine and has previously served as an ICU director. In connection with his testimony, Dr. Tynes reviewed the VAMC records spanning Mr. Hamilton's entire hospitalization (from July 2006 to May 2009), the depositions and declarations of the physicians involved, the report of Plaintiff's expert, Dr. Walton, and the report of Dr. Velva Boles.

Dr. Tynes believed that Dr. Negi and the VAMC met the standard of care in treating Mr. Hamilton. In his report, Dr. Tynes concluded that Mr. Hamilton's extubation followed the standard sequence of removing a patient from mechanical ventilation, which required the patient to be weaned down from ventilator-supplied support over a period of time. He explained that once the patient has been weaned and has demonstrated the ability to self-oxygenate without such support, the patient should be extubated. Further, he stated that a patient should be observed for at least 24 hours to ensure he is stable before transfer to the floor. In his expert opinion, Mr. Hamilton's ability to support his own respiratory status was made known after three days of observation on CPAP, at which time Dr. Negi determined that he was clinically stable and could be extubated. Dr. Tynes admitted there was no medical emergency that required Mr. Hamilton to be extubated. However, he believed that Dr. Negi considered all of the information available to her and therefore agreed with her clinical decision.

Dr. Tynes did not find that Mr. Hamilton's low Glasgow precluded extubation. He testified that a patient's Glasgow score is one of several considerations for deciding whether to extubate or transfer a patient, and that a physician must look at the patient's entire clinical picture when making therapeutic decisions. Moreover, Dr. Tynes did not interpret Dr. St. Cyr's September 22 note as a directive to maintain intubation, and he found nothing in the medical record that would have precluded Dr. Negi from exercising her own clinical judgment. He explained that in the absence of a specific directive from the treating physician, the covering physician must use her own clinical judgment to make decisions regarding the patient's treatment, even if that decision deviates from the

treating physician's recommendation. When asked about his understanding of Dr. St. Cyr's note, he explained that he believed it reflected Dr. St. Cyr's clinical judgment that protection of Mr. Hamilton's airway was an overriding concern. However, Dr. Tynes explained that, while an endotracheal tube can provide airway protection, it also makes breathing more difficult, places the patient at increased risk of infection, can result in damage to the lungs, and does not guarantee against aspiration. Therefore, he expressed the view that chronic pulmonary patients like Mr. Hamilton should be extubated as soon as reasonably possible.

As to the discontinuation of antibiotics, Dr. Tynes acknowledged that the treating physician must conduct a clinical examination to determine whether the patient's clinical picture is compatible with the absence of pneumonia before discontinuing antibiotics. He testified that signs of active infection include fever and elevated white blood cell count, but that the physician must examine the patient's entire clinical picture. Further, he explained that aspiration pneumonia is treated with antibiotics when a bacterial source is present; absent fever, putrid sputum, or a positive culture or gram stain, antibiotics are not necessary. Dr. Tynes did not disagree with Dr. Negi's decision to discontinue antibiotics; indeed, he observed that there was no culture-proven evidence to warrant continued antibiotic treatment. Moreover, Dr. Tynes did not find that Dr. Negi breached the standard of care in failing to perform an x-ray or culture. He testified that physicians do not typically obtain a culture prior to discontinuing antibiotics. He also testified that the decision to discontinue antibiotics is not based on

27

an x-ray alone because x-rays can lag behind a patient's clinical progression, which is consistent with the testimony of Drs. St. Cyr and Negi.

Dr. Tynes further indicated that Mr. Hamilton's transfer to a nonacute floor met the standard of care. He noted that Mr. Hamilton was observed in the ICU for 24 hours before Dr. Negi determined that he could be transferred. From his review of the record, Dr. Tynes felt that the nursing, respiratory therapy, and physician care were well-coordinated when Mr. Hamilton was moved to the floor. He observed that Dr. Negi's transfer orders, which governed Mr. Hamilton's care on the floor, provided for regular suctioning, oxygen via nasal cannula, and general aspiration precautions. He also noted that Hamilton was seen by nursing staff and by Dr. Akwa after he was transferred, and that Dr. Akwa determined Mr. Hamilton was stable enough to remain on the floor.

Regarding the communication and informed consent issues, Dr. Tynes testified that there is no standard of care breach when a physician fails to discuss a patient's condition and agree on a course of treatment with the patient's family. While he acknowledged that a physician is expected to maintain open communication with the patient's family at all stages of health care treatment, he testified that informed consent is not required to extubate or transfer a patient. Moreover, he found no evidence that informed consent was required on previous and subsequent occasions when Mr. Hamilton was extubated or transferred.

Finally, Dr. Tynes did not agree that Mr. Hamilton had a significant chance of recovery prior to September 23, 2006, due to his clinical course and presentation after the September 14 arrest, and he did not believe the events of September 23–24 contributed

to any loss of Mr. Hamilton's chance for survival. First, Dr. Tynes explained that because Mr. Hamilton suffered from bullous emphysema secondary to chronic tobacco abuse, he required long-term ventilator support for survival. The expert observed that patients with emphysema can develop pneumothoraces when presented with positive pressure ventilation, and that this happened to Mr. Hamilton on more than one occasion. Moreover, each successive episode of aspiration caused Mr. Hamilton to suffer additional pulmonary inflammation and subsequent fibrosis, which caused further decline in his poor pulmonary function. Second, Dr. Tynes observed that Mr. Hamilton was found to have invasive adenocarcinoma of the lung at autopsy, which caused his condition to worsen despite the administration of every life-sustaining measure. Third, Dr. Tynes noted that Mr. Hamilton experienced multiple episodes of acute worsening, aspiration, or stroke, both before and during his VAMC hospitalization, each of which added to his total debility, poor pulmonary function, and neurological deficits. Dr. Tynes found no evidence that the events of September 23–24 caused Mr. Hamilton's condition or rate of decline to worsen any more than these other episodes of worsening.

Moreover, Dr. Tynes believed that Mr. Hamilton was showing objective signs of brain damage prior to September 22. In his expert opinion, Mr. Hamilton was in a persistent vegetative state after the acute worsening on September 14, 2006, from which he never recovered. He found no evidence that Mr. Hamilton suffered additional neurological injury on September 23–24. In fact, he noted that Mr. Hamilton's neurological condition was "exactly the same, if not a little better," after the September 23 weekend. (R. at 338). Upon questioning by the Court, Dr. Tynes also testified that a

29

patient is immediately susceptible to anoxic brain injury when the patient's oxygenation saturation dips below 80%, which did not occur until after Mr. Hamilton was transferred back to the ICU on September 25, 2006.

### D.   Additional Evidence

#### 1.   _Dr. Negi's Behavior_

Dr. St. Cyr testified that during his VAMC employment, he worked with and was supervised by Dr. Negi. He described her as being difficult to work with and testified that she had "different personalities" and was "very aggressive" at times. (R. at 64). However, he denied having conflicts with her regarding patient treatment and admitted that she was "knowledgeable" and "a good doctor." (R. at 34–35, 64).

Nurse Mioton testified that on several occasions, Dr. Negi became infuriated when a patient or family refused to sign a DNR. In some instances, he believed that Dr. Negi was premature in her decision to discuss a patient's DNR status. However, he was not present during any DNR-related discussions between Dr. Negi and Plaintiff. On cross-examination, he acknowledged that a physician is better qualified to determine when DNR orders should be discussed with a patient or family. Dr. Negi denied that she became infuriated with patients or families who refused to sign DNR. She did admit, however, that the VAMC administration required her to participate in anger management classes.

#### 2.   _VAMC Facility and Transfer Procedures_

Dr. St. Cyr provided testimony concerning VAMC procedures for transferring patients out of the ICU, which required the transferring physician to issue orders to

nursing staff with information regarding the patient's condition and directions for subsequent treatment and care. He indicated that a patient who required frequent suctioning was typically placed in the ICU or an intermediary setting. However, he agreed that suctioning was also available on a nonacute floor.

Dr. St. Cyr and Nurse Mioton both testified that the VAMC had a step-down or transitional unit for patients who required close monitoring after being transferred out of the ICU, which was contradicted by Dr. Negi. According to Nurse Mioton, the transitional unit at that time was 7B North, which was located on the third floor outside of the ICU. He testified that 7B North provided telemetry monitoring, which was not available on 7C South, and that patients requiring closer monitoring might have been moved to 7C South if there were no available beds on 7B North.

Dr. Negi testified, on the other hand, that the VAMC did not have a transitional unit, and that 7B North was solely a telemetry medical ward. On cross-examination, Dr. Negi explained that she was responsible for writing transfer orders and for designating whether a patient required telemetry monitoring, which was available only on the third floor, but she did not play a role in floor assignments. Rather, the VAMC admissions officer was responsible for deciding the hospital location to which a patient was transferred based on bed availability.

### 3. *Communication Issues*

On cross-examination, Dr. St. Cyr provided testimony regarding the procedure for communicating a treatment plan to a follow-up physician, which required the treating physician to speak to the follow-up physician in person or to write a note on a piece of

31

scratch paper. Consistent with Dr. Negi's testimony, Dr. St. Cyr admitted that he did not instruct her, either orally or in writing, not to extubate Mr. Hamilton. He also acknowledged that an on-call physician like Dr. Negi could exercise her own clinical judgment in treating a patient, even if it deviated from the treating physician's plan. He testified that there was no hospital policy requiring Dr. Negi to report to him prior to changing Mr. Hamilton's course of treatment, which Dr. Negi also confirmed. Likewise, Dr. St. Cyr admitted there was no VAMC policy requiring Dr. Negi to speak to Plaintiff prior to extubating Mr. Hamilton. He also indicated that informed consent was not required in order to extubate or transfer Mr. Hamilton.

>    4.    *Dr. Negi's Licensure and Credentialing*

At trial and in post-trial brief, Plaintiff raised issues regarding Dr. Negi's credentialing and medical licensure.[20] Plaintiff contends that Dr. Negi's Virginia medical license was based on an untruthful application. Therefore, the argument is that Dr. Negi's employment at the VAMC was based on fraudulent licensing in Virginia. (Plaintiff's Proposed Findings of Facts, Doc. 271). Upon questioning by counsel for both parties, Dr. Negi provided testimony at trial regarding her credentialing. Following the trial, we ordered the parties to submit additional evidence on the single issue of whether Dr. Negi voluntarily withdrew a Florida application to practice medicine in a fraudulent

---

[20] On November 26, 2012, Floyd Hamilton, Jr. and four other plaintiffs filed suit in the Ninth Judicial District Court for the Parish of Rapides, State of Louisiana, against Dr. Negi, the Commonwealth of Virginia, and two Virginia Board of Medicine officials regarding Dr. Negi's Virginia license to practice medicine. That suit was subsequently removed to this Court. Floyd Hamilton, et al. vs. Shivani Negi, et al., 1:13-cv-0041. By Judgment dated June 3, 2013 (ECF Doc. 27), the claims against the Commonwealth and the Board of Medicine officials were dismissed for lack of jurisdiction, the claims against Dr. Negi were dismissed on immunity grounds, and the Government was substituted as the proper defendant.

attempt to hide her false credentials. The Government has since submitted the declarations of Jennifer Deschenes, Deputy Executive Director of Discipline for the Virginia Board of Medicine, and Chandra Prine, Program Operations Administrator for the Florida Board of Medicine, which was received into evidence on August 18, 2013. (Doc. 261). Plaintiff submitted the affidavit of Meaghan Donovan, of Burgos & Evans, LLC, which has not been received into evidence. (Doc. 260). The record evidence establishes the following facts:

In March 2003, Dr. Negi applied for a medical license in the state of Florida. When asked whether she had ever been suspended, placed on probation, expelled, or asked to resign from a postgraduate training program, Dr. Negi answered in the negative. Upon completion of the application, she was asked to appear before the Credentials Committee of the Florida Board of Medicine. Dr. Negi told the committee she had not been placed on probation or suspended during her residency at Maryland General Hospital. However, it was discovered that she had only been reprimanded and required to attend a mandatory ethics training for altering medical records. According to Dr. Negi, she was orally advised by Florida officials that she could either withdraw from the application process, or continue with her application and risk denial, but was told to wait until she received a formal notice. Dr. Negi further testified that before a formal notice was issued, she applied for a Virginia medical license. When the Virginia application asked whether she had ever been denied a medical license, Dr. Negi answered in the negative.

33

On recommendation from the credentials committee, the Florida Board of Medicine determined that Dr. Negi had lied under oath before the committee and found her guilty of making deceptive representations related to the practice of medicine and of misrepresenting or concealing a material fact during the licensing process in violation of Florida law. The Board issued a formal Notice of Intent to Deny Licensure ("Notice") on October 7, 2003, and it was received by Dr. Negi via certified mail on November 7, 2003. The Notice provided as follows: "It is therefore ORDERED that the application for licensure be DENIED: Applicant has fourteen (14) days from the date of this Order to withdraw the application." (Pl. Exh. 88).

Dr. Negi testified that she voluntarily withdrew her application in late September or early October 2003. Officials from the Florida and Virginia licensing authorities confirmed that Dr. Negi withdrew her application and that the Notice did not become final. (Deschenes Affidavit, Doc. 261-3; Prine Affidavit, Doc. 261-4). Although she did not inform the Virginia licensing authority of the Notice, Dr. Negi did report the withdrawal of her Florida application. Virginia officials later determined that Dr. Negi had not been denied a license and therefore was not obligated to report her withdrawal to the Virginia Board of Medicine. (Deschenes Affidavit, Doc. 261-3).

## IV.   Analysis

### A.   Extubation

First, Plaintiff contends that Mr. Hamilton should not have been extubated, and that Dr. Negi and the VAMC were medically negligent in failing to ensure appropriate respiratory support for Mr. Hamilton during the September 23 weekend. We note,

however, that Mr. Hamilton's extubation was the end result of a gradual weaning process initiated by Dr. St. Cyr. Prior to his extubation, Mr. Hamilton was gradually weaned from mechanical ventilation and allowed to breathe on his own in accordance with the standard of care. Although his breathing tube was still in place, Mr. Hamilton's ventilator had been set to the CPAP setting since September 20, 2006. After three days of spontaneous breathing on CPAP, Mr. Hamilton remained stable and thus demonstrated the ability to support his own respiratory status. Accordingly, extubation was appropriate at that time.

Plaintiff also claims that Dr. Negi ignored objective data, such as Mr. Hamilton's low Glasgow score, that necessitated continued intubation. However, the above evidence, taken as a whole, provides sufficient basis to find that Dr. Negi appropriately considered Mr. Hamilton's entire clinical picture before deciding to extubate him. Evidence of Mr. Hamilton's secretion history, Glasgow score, and vital signs was available in his medical chart. Furthermore, Dr. Negi testified that she conducted a clinical examination of Mr. Hamilton before she deemed him stable enough for extubation. The experts and treating physicians all testified that Glasgow score was only one consideration for extubation. Dr. Walton even stated that Mr. Hamilton's Glasgow score was not an important consideration in this case. Thus, we cannot say that Mr. Hamilton's low Glasgow score precluded extubation.

Likewise, Dr. Negi was not bound by Dr. St. Cyr's September 22 progress note. The evidence shows that Dr. St. Cyr's note was a recommendation, rather than an order or directive to maintain continued intubation. While Dr. St. Cyr was of the opinion that

continued intubation was necessary in order to protect Mr. Hamilton's airway, he agreed that continued intubation was an option for Mr. Hamilton's treatment and that Dr. Negi had the right to exercise her clinical judgment based on all of the information available to her. Dr. Negi testified that she disagreed with Dr. St. Cyr's assessment based on her clinical judgment and Mr. Hamilton's clinical presentation. In her view, the risks of prolonged mechanical ventilation outweighed the benefits of continued intubation. Moreover, Drs. Walton and Tynes deferred to Dr. Negi's clinical judgment and indicated that extubation was a reasonable option at that time. Neither expert found that Dr. Negi breached the standard of care in extubating Mr. Hamilton. Accordingly, the evidence does not show by a preponderance that Mr. Hamilton's extubation fell below the standard of care defined above.

### B.    Discontinuation of Antibiotics

Plaintiff next contends that the discontinuation of pneumonia-fighting antibiotics breached the standard of care. Yet, when Dr. Negi evaluated Mr. Hamilton on September 24, 2006, she determined that he showed no signs of active infection. Indeed, Mr. Hamilton had stable vitals, normal heart and respiratory rates, good oxygenation, and no fever at that time. Likewise, there was no evidence of putrid sputum or a positive culture to warrant continued antibiotic treatment. The experts again deferred to Dr. Negi's judgment as to whether Mr. Hamilton had an active infection and did not disagree with her decision to discontinue antibiotics.

Plaintiff notes, and the medical record confirms, that Dr. Akwa restarted Mr. Hamilton's antibiotics less than one day after he was removed from the ICU.

Nevertheless, Dr. Akwa did not document the basis for her decision to restart antibiotics. The medical record shows that Dr. Akwa examined Mr. Hamilton's previous chest x-ray, which showed worsening infiltrates. Drs. St. Cyr, Negi, Walton, and Tynes agreed, however, that chest x-rays can lag behind a patient's clinical progression. Moreover, Drs. Tynes and Negi both felt that Dr. Akwa prescribed antibiotics because she was concerned about Mr. Hamilton's overall condition and was uncomfortable doing nothing to treat the patient; they did not believe it was necessary to restart Mr. Hamilton's antibiotic treatment at that time. In fact, Dr. Tynes observed that Mr. Hamilton had been on chronic antibiotics for his entire hospitalization, with little objective evidence they were helping his overall condition. Based on the totality of the evidence, we find no breach of the standard of care due to the discontinuation of antibiotics.

We also find no breach of the standard of care due to Dr. Negi's failure to perform a blood test, x-ray, or culture. Based on the standard of care described above, Dr. Negi was not obligated to perform such tests prior to discontinuing Mr. Hamilton's antibiotic coverage. The experts explained that the discontinuation of antibiotics is a clinical judgment based on the patient's entire clinical picture. In accordance with this standard, Dr. Negi testified that she listened to Mr. Hamilton's lungs, examined his vital signs and secretion levels, and looked for other indications of continued infection, such as fever, low oxygen saturation, increased heart rate, or increased respiratory rate. She also testified that she reviewed Mr. Hamilton's chart history. Only after this work-up did she determine that he was clinically improved and had run his course of antibiotics. Under

the circumstances, the evidence does not show by a preponderance that Dr. Negi's failure to perform a blood test, x-ray, or culture fell below the standard of care.

### C.    ICU Transfer

Plaintiff also claims that Dr. Negi breached the standard of care when she transferred Mr. Hamilton from the ICU to a nonacute floor without ensuring appropriate respiratory support. In addition to the three days of observation on CPAP, Mr. Hamilton remained in the ICU for an additional 24 hours post-extubation. During that period, he did not have difficulty using a nasal cannula with oxygen flowing at 2 liters per minute and his vital signs remained stable. Additionally, in the exercise of her clinical judgment, Dr. Negi found that Mr. Hamilton's secretions were decreasing overall. As there was no indication that Mr. Hamilton required ventilator support or continued ICU care, it was appropriate for Dr. Negi to transfer him to a medical ward at that time.

Dr. Walton disagreed on this point and expressed the opinion that Mr. Hamilton should have remained in the ICU for a longer period of time. Yet, his opinion was based on the subsequent course of events that took place on September 25, 2006. As noted above, we must evaluate Dr. Negi's conduct "in terms of reasonableness under the circumstances existing when [her] professional judgment was exercised." Thibodaux, 981 So.2d at 689. We do not examine her conduct "with the benefit of hindsight." Id. Furthermore, we note that Dr. Walton, who only reviewed limited VAMC records provided by Plaintiff, was unaware of Dr. Negi's transfer orders, which provided for general aspiration precautions and suctioning on the floor. The medical record reflects that nursing care, respiratory therapy, and physician care were well-coordinated when

Mr. Hamilton was transferred. Moreover, Mr. Hamilton was seen by nursing services and by Dr. Akwa, who determined that Mr. Hamilton was stable and could remain on the floor overnight.

Plaintiff suggests that even if Mr. Hamilton was stable enough to be transferred out of the ICU, Dr. Negi should have moved him to 7B North, the third floor telemetry unit. In the Amended Complaint, Plaintiff asserts that the failure to provide Mr. Hamilton with cardiac monitoring fell below the standard of care. However, Plaintiff has failed to establish the applicable standard of care for transferring a patient to a telemetry medical ward, rather than a non-telemetry floor. Dr. Negi testified that she played no role in assigning patients to a particular medical floor, and we do not have sufficient evidence before us to conclude that her failure to transfer Mr. Hamilton to the telemetry ward, or the VAMC's failure to provide him with cardiac monitoring, breached the standard of care. While Mr. Hamilton's passing is unfortunate, a preponderance of the evidence does not show that Dr. Negi or the VAMC failed to meet the standard of care in treating Mr. Hamilton.

### D.   Informed Consent

Finally, Plaintiff argues that the VAMC deliberately disregarded the family's wishes that Mr. Hamilton receive complete medical support. However, the evidence does not establish that Dr. Negi had a duty to obtain informed consent in order to extubate Mr. Hamilton, discontinue his antibiotic coverage, or transfer him from the ICU to a nonacute floor. Drs. St. Cyr, Negi, Walton, and Tynes all agreed that extubation was not an invasive procedure requiring a patient or surrogate's consent. Even Dr. Walton

39

admitted that the VAMC Handbook did not list extubation as a procedure for which informed consent was necessary. Likewise, the evidence shows that the decisions to discontinue antibiotics and to transfer Mr. Hamilton were therapy decisions for which the family's consent was not required. To reiterate, although Plaintiff was Mr. Hamilton's power of attorney, Dr. Negi had the right and duty, as Mr. Hamilton's treating physician, to provide the treatment she thought was best, even if it deviated from the family's wishes.

Moreover, while Dr. Negi did not obtain Plaintiff's informed consent, the evidence shows that she did discuss the risks of extubation with Plaintiff, and that Plaintiff understood those risks. The evidence also shows that Dr. Negi informed Plaintiff of her intent to extubate and transfer Mr. Hamilton during their September 23 telephone conversation, which she twice noted in the medical record. Indeed, the medical record demonstrates that Plaintiff was apprised of the care and treatment provided by all attending physicians, including Dr. Negi.

Dr. Tynes observed, and we agree, that a physician should consider the wishes of a patient's family when determining the clinical support that the patient will receive. Additionally, a physician should always maintain open communication with a patient's family during the course of treatment. Nevertheless, informed consent is not required for every therapy decision. As discussed above, we are sympathetic to Plaintiff's loss, and we believe Dr. Negi had a very poor bedside manner in her dealings with Plaintiff and Mrs. Hamilton. It is evident that her manner was a detriment to a positive relationship with the patient's family. The facts of this case clearly demonstrate the value of open

communication between a physician and a patient's family at every step of health care delivery. However, based on the totality of the evidence, taking the relative weight and credibility into account, we cannot conclude that Dr. Negi was medically negligent in her treatment of Mr. Hamilton, or that she had a duty to obtain informed consent in this case.

  E. **Causation**

  Because we do not find that Dr. Negi breached the standard of care, or that she had a duty to obtain informed consent, it is not necessary to address the element of causation or Plaintiff's arguments regarding Dr. Negi's licensure and credentialing.

V. <u>Conclusion</u>

  For the foregoing reasons, this Court renders judgment in favor of Defendant, the United States of America.

  SIGNED on this 31st day of March, 2014 at Alexandria, Louisiana.

          DEE D. DRELL, CHIEF JUDGE
          UNITED STATES DISTRICT COURT

41